IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN TEZAK, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No.: 1:20-cv-2482 |
| vs. | ) ) | |
| LIVE NATION ENTERTAINMENT, INC., a Delaware Corporation, TICKETMASTER ENTERTAINMENT, LLC, a Delaware Limited Liability Company, and TICKETMASTER ENTERTAINMENT, INC., a Delaware Corporation, | ) ) ) ) ) ) | Honorable |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.      Plaintiff John Tezak ("Plaintiff"), by and through his counsel, files this Class Action Complaint against Live Nation Entertainment Inc. ("Live Nation") Ticketmaster Entertainment LLC, and Ticketmaster Entertainment, Inc. (together "Ticketmaster") (collectively with Live Nation "Defendants"), on behalf of himself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to his own actions, and upon investigation of counsel as to all other matters, as follows:

**NATURE OF THE ACTION**

2.      In the midst of the greatest public health and economic crisis in living memory, countless American individuals, organizations, and business enterprises have stepped up to help those who have been hardest hit. Unfortunately, a select few companies have sought to force their customers to bear the brunt of their own shortsightedness. Defendants, household names that dominate the live entertainment industry, have sought to surreptitiously shift their losses onto their innocent customers, furthering the financial hardship endured by people across the country.

3.      Live Nation is the parent company of Ticketmaster and according to its own description

"the largest live entertainment company in the world".[1] Ticketmaster is the nation's most dominant ticketing company, and it provides ticketing services for most if not substantially all of Live Nation's events.

4.      Plaintiff brings this action on behalf of himself and a class of similarly situated individuals who purchased tickets to Defendants' events, which in response to apparent liabilities they would incur stemming from the COVID-19 pandemic, Defendants "postponed" indefinitely so that they could keep their customers' money as a form of interest-free loan.

5.      Defendants have quietly sought to force their buyers to endure the financial losses that Defendants created for themselves in the entirely foreseeable scenario that world occurrences would cause the simultaneous cancellation of numerous public events.

6.      Defendants' uniform conduct is equally applicable to the class.  Plaintiff brings this class action against Defendants for: (1) breach of contract; (2) conversion; (3) negligent misrepresentation; (4) violations of the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et seq.*; (5) violations of the Illinois Ticket Sale and Resale Act, 815 ILCS 414/1.5 *et seq,*; and (6) unjust enrichment. Plaintiff seeks an order requiring Defendants to, among other things: (1) cease retaining funds for any cancelled and/or constructively cancelled event; (2) cease listing events as postponed when they know that that they cannot reasonably be rescheduled; and (3) pay damages and/or restitution to Plaintiff and Class members.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from

---

[1]  Live Nation's 2019 10k (available at https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-20-000028/0001335258-20-000028.pdf) (last visited April 23, 2020).

Defendants. The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the state in which Defendants are citizens.

8.     This Court has personal jurisdiction over Defendants because they conduct significant, substantial, and not-isolated business activities in Illinois and a substantial portion of the acts complained of took place in Illinois. Defendants' Terms of Service also require submission to the Jurisdiction of the State of Illinois.

9.     Venue is proper in the Northern District of Illinois because Defendants conduct business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

10.     Plaintiff John Tezak is an individual and a citizen of Illinois.

11.     Defendant Live Nation Entertainment Inc. is a Delaware corporation with its principal place of business located in Beverly Hills, California.

12.     Defendant Ticketmaster Entertainment, Inc. is a Delaware Corporation and a subsidiary of Live Nation, with its principal place of business located in Beverly Hills, California

13.     Defendant Ticketmaster Entertainment, LLC is organized under the laws of Delaware and is a subsidiary of Live Nation, with its principal place of business located in Beverly Hills, California

## FACTUAL ALLEGATIONS

14.     Live Nation is a juggernaut. Not only does it produce live entertainment events, but it owns many of the entertainment venues that it utilizes and manages many of the entertainers whose shows it produces.

15.     By its own account, Live Nation "connect[ed] nearly 98 million fans to more than

40,000 events for over 5,000 artists in 2019."[2]

16.     In addition to producing events, Live Nation owns, operates, has exclusive booking rights for or has an equity interest in some 273 entertainment venues.[3]

17.     As of the end of 2019, Live Nation employed 110 artist managers "manag[ing] music artists and acts across all music genres" providing "services" to more than 500 artists.[4]

18.     Live Nation's ticketing business subsidiary Ticketmaster "provides ticket sales, ticket resale services and marketing and distribution globally through www.ticketmaster.com and www.livenation.com and our other websites, mobile apps, numerous retail outlets and call centers, selling over 485 million tickets in 2019 through our systems. Ticketmaster serves nearly 11,500 clients worldwide across multiple event categories, providing ticketing services for leading arenas, stadiums, festival and concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters."[5]

19.     Defendants "sell tickets through websites, mobile apps, ticket outlets and telephone call centers. During 2019, [they] sold 48%, 48%, 3% and 1% of primary tickets through these channels, respectively." [6]

20.     Live Nation reports that "our Concerts business generated $9.4 billion, or 81.6%, of our total revenue during 2019." [7] Its total revenue for 2019 was $11.5 billion.[8]

21.     As a massive, dominant international corporation, Live Nation knows the risks that its business faces. In its 2019 SEC filings, it noted that "[w]e may be adversely affected by the occurrence

---

[2] 10k.

[3] *Id.*

[44] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

of extraordinary events, such as terrorist attacks or disease epidemics."

22.     Live Nation has admitted, prior to the American expansion of the Covid-19 crisis, that "[t]he occurrence and threat of extraordinary events, such as terrorist attacks, intentional or unintentional mass-casualty incidents, public health concerns such as contagious disease outbreaks, natural disasters or similar events, may deter artists from touring and/or substantially decrease the use of and demand for our services and the attendance at live music events, which may decrease our revenue or expose us to substantial liability."

23.     As Live Nation notes, such disruptions are not at all unprecedented. "The terrorism and security incidents in the past, military actions in foreign locations, periodic elevated terrorism alerts and fears from publicized contagious disease outbreaks have raised numerous challenging operating factors, including public concerns regarding air travel, military actions and additional national or local catastrophic incidents, causing a nationwide disruption of commercial and leisure activities."

24.     Live Nation has long known that "[a]ttendance at events may decline due to fears over terrorism and contagious disease outbreaks, which could adversely impact our operating results."

25.     Live Nation knew that the timing of any such outbreak could disproportionately disrupt its business, since "[w]hile our Concerts segment operates year-round, we generally experience higher revenue during the second and third quarters due to the seasonal nature of shows at our outdoor amphitheaters and festivals, which primarily occur from May through October." [9]

26.     Despite Live Nation's awareness of the risks it faced, it limited its ability to respond to those risks through the acquisition and maintenance of debt. It recently admitted that "[w]e have a large amount of debt and lease obligations that could restrict our operations and impair our financial condition." [10]

---

[9] *Id.*
[10] *Id.*

5

27.     Even with its precarious leverage situation, Live Nation should have been relatively well-prepared for the type of disruptions it knew could happen. As it acknowledges, "we generally receive cash related to ticket revenue at our owned or operated venues and festivals in advance of the event, which is recorded in deferred revenue until the event occurs. With the exception of some upfront costs and artist deposits, which are recorded in prepaid expenses until the event occurs, we pay the majority of event-related expenses at or after the event." [11]

28.     This background makes Defendants' actions in responding to the Covid-19 pandemic and the pain they have inflicted on their customers all the more unreasonable.

### The Pandemic

29.     The scope, scale, and hurt of the Covid-19 pandemic are by now familiar to all.

30.     On January 7, 2020, an outbreak of viral pneumonia in China's Hubei province was identified as a new coronavirus.

31.     On January 20, 2020, the World Health Organization reported the first confirmed cases of the new coronavirus outside of China, in Thailand, Japan, and South Korea.

32.     On January 21, 2020, the United States announced its first known case of the new coronavirus.

33.     On January 23, 2020, China placed the City of Wuhan and its 11 million residents under strict quarantine orders.

34.     On January 30, as the outbreak spread to 19 countries and more than 9,000 cases had been detected, the World Health Organization declared the outbreak a public health emergency.

35.     On January 31, 2020, President Trump announced that the federal government would ban entry to most foreign nationals who had traveled to China within the last 14 days.

36.     On February 11, 2020, the World Health Organization announced that the disease

---

[11] *Id.*

caused by the new coronavirus would be officially named Covid-19.

37.     On February 26, 2020, Defendants' home state of California announced its first apparent case of local transmission of the virus.

38.     On February 29, 2020, President Trump announced additional travel restrictions involving Iran and issued increased warning regarding travel to Italy and South Korea. That same day, a man from Washington became the first known American fatality from Covid-19.

39.     Large scale events began cancellations. On March 4, 2020, Miami's Ultra Music Festival announced the cancellation of its annual gathering of tens of thousands of fans. Two days later, Austin's yearly South by Southwest festival, a gathering that brings some 400,000 people together, was cancelled.

40.     On March 11, 2020, the National Basketball Association announced the suspension of its season, and the next day the National Hockey League followed suit.

41.     In the following days and weeks, it became apparent that all large-scale gatherings would need to be stopped to limit the spread of the virus. Live Nation announced the cessation of all concert tours on March 12.

42.     On March 19, California Governor Gavin Newsom ordered the state's nearly 40 million people to stay at home save for a few essential purposes.

43.     Nearly every state followed suit, with some form of similar order issuing in all but a few states.

44.     Illinois' stay-at-home order was effective on March 21.

45.     As a result of the virus and the response thereto, the nation's economy has largely ground to a halt. Companies of all sizes and individual citizens have been forced to cope with the loss of income.

46.     While everyday people were forced to make difficult decisions and thrust into a state of constant worry about their health, their loved ones, and their ability to pay the bills, Defendants took to

a policy of hoarding money they had collected for events that they knew could not occur.

47.     Ticketmaster drew nationwide ire when on or about April 13, 2020, it made a "clarification" to its refund policy that noted that while refunds would be made for events that were "cancelled," refunds for events that were postponed or rescheduled were at the discretion of the event promoter.

48.     Of course, the absurdity of this position is that *Live Nation is the event promoter* for an enormous percentage of Ticketmaster's events, and Live Nation had indefinitely "postponed" hundreds or thousands of events that plainly could not occur any time in the foreseeable future.

49.     The outrage at Ticketmaster was swift and furious. One Twitter user who was widely quoted in various media outlets vented that it was "[c]omforting to know that even when the world is in the grips of a pandemic, Ticketmaster remains committed to being just a surprisingly large piece of [expletive]."[12]

50.     On April 26, 2020, Members of the United States House of Representatives sent a letter to both Defendants, which noted that they were "incredulous at Ticketmaster's announced policy to refuse refunds to all requesting fans for ticketed events postponed by the Covid-19 pandemic." It continued that "[w]ith Americans weathering the brutal and continuing impacts of this global crisis, your decision to confiscate their money is reprehensible and should be reversed immediately."

51.     "Instead of helping [its customers] lift [the] burden, your company has decided to make it heaver[,]" the letter added. "Given your enormous power over the marketplace, your company's assertions that this inability to obtain a full refund for postponed events [] rings hollower than a drum. In effect, your company is holding hostage money that could constitute a rent check, electric bill, or groceries to feed children."

52.     In response to this backlash, on April 17, 2020 Ticketmaster (through its president)

---

[12] https://www.usatoday.com/story/entertainment/music/2020/04/13/coronavirus-ticketmaster-changes-refund-policy-sparks-outrage/2986708001/ (last visited April 21, 2020).

issued a statement that noted that refunds had been authorized for a mere 5,000 of the company's 55,000 events scheduled to take place between March 1 and the end of 2020. It added that "as of today… Live Nation… [has] announced that they will begin to provide refunds, on a rolling basis, for all events impacted by Covid-19."

53.     The statement referred to Live Nation as one of Ticketmaster's two largest event organizers, without reference to the fact that it is actually Ticketmaster's parent company.

54.     Though details have scarcely been communicated other than through the media, Live Nation's apparently intends to roll out a new "Rock When You're Ready" plan which indicated that beginning May 1, fans would have 30 days to request a refund for shows which had been rescheduled for a specific date in the future. Any event that was "postponed" but not "rescheduled" would become eligible for a 30 day refund period when (if) it received a new date.

55.     Live Nation's plan is obviously suspect given that it allows the company to retain all funds associated with "postponed" events until a triggering event of its own choosing takes place.

56.     The policy is even more problematic given the near-certainty that large scale events will not be permitted to occur in 2020.

57.     At some point, it is no longer unreasonable to call an event postponed. If it occurs later than the next occurrence of that event would have, it is clearly a different event. For example, when an annual music festival is "rescheduled" for its usual time slot in the following year, it is functionally the same as a cancellation.

58.     Live Nation's plan also appears designed to push customers toward alternatives to refunds, such as credits and potentially deferred "charitable" donations'

59.     Live Nation continues to hold thousands of events, including many dozens of Illinois events, in purgatory, so that it can retain the proceeds of the ticket sales by not acknowledging that there is little to no likelihood that the events can be rescheduled.

60.     More than 60 events in Chicago alone are currently listed by Live Nation as postponed,

and countless others are scheduled for dates on which they clearly will not occur.

61.     For example, Live Nation still lists Chicago events scheduled for June and July, despite the fact that Illinois Governor JB Pritzker has advised the cancellation of all large events through summer.

62.     In fact, Governor Pritzker noted that "I do not see how we are going to have large gatherings of people again until we have a vaccine, which is months and months away."

63.     Most experts predict that the earliest possible time that a vaccine may become widely available is sometime in mid to late 2021.

64.     Live Nation and Ticketmaster are therefore knowingly retaining funds that they collected from customers for events that they know cannot reasonably be rescheduled.

### *Defendants' User Agreement*

65.     Defendants share Terms of Use **(Exhibit 1)** that by their terms apply to customers' use of "Live Nation and Ticketmaster's sites and mobile applications" and "purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services."

66.     Defendants' Terms of Use were last updated June 25, 2019.

67.     The Terms of Use incorporate Defendants' Privacy Policy and Purchase Policy **(Exhibit 2)** by reference.

68.     The Terms of Use purport to require most users to waive their right to a jury trial or to participate in a class action, however various terms of those provisions and the clauses themselves are unenforceable.

69.     In contrast, the Terms of Use expressly require users to "submit to the jurisdiction of the State of Illinois for any complaints involving a ticketed event held in Illinois.:

70.     The Purchase Policy, incorporated in the Terms of Use, provides that "[i]f an event is canceled, and you purchased your ticket through [Ticketmaster], our phone center, or Fan-to-Fan, we

will automatically issue you a refund to the credit card, debit card, gift card or the method of payment used to make your purchase."

71.     The Purchase Policy states that "[y]ou agree that you will not attempt to evade, avoid, or circumvent any refund prohibitions in any manner with regard to tickets you purchased. Without limiting the generality of the foregoing, you will not contact us to seek a refund or exchange from us when we are prohibited from providing one by its clients, and you will not dispute or otherwise seek a 'chargeback' from the company whose credit card you used to purchase tickets from the Site. Should you do so, your tickets are subject to immediate cancellation, and we may, in our sole discretion, refuse to honor pending and future ticket purchases made from all credit card accounts or online accounts on which such chargebacks have been made, and may prohibit future purchases from all persons in whose name the credit card accounts exist and any person who accesses any associated online account or credit card or who otherwise breaches this provision from using the Site."

### *Plaintiff's Purchase of Defendants' Tickets*

72.     On or about mid-December of 2019, Plaintiff Tezak purchased two tickets from Defendants to their March 17, 2020 Blake Shelton concert at the Allstate Arena in Rosemont Illinois.

73.     Plaintiff paid approximately $300 for the two tickets.

74.     Due to the pandemic, the concert did not occur, but was "postponed" indefinitely.

75.     Defendants received Plaintiff's money for a concert that cannot reasonably be expected to occur any time in the foreseeable future and are refusing to refund it.

### CLASS ALLEGATION

76.     Plaintiff brings this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

> All persons residing in the United States or its territories who purchased tickets to a Live Nation event that did not or cannot occur and to whom Defendants have not provided a refund. Excluded from the Class are (a) any person who has specifically requested a coupon in lieu of a refund; (b) all persons who are employees, directors, officers, and agents of either Defendant; (c) governmental entities; and (d) the Court, the Court's immediate family, and Court staff.

77.     Alternatively, Plaintiff seeks certification of a proposed class defined as:

All persons residing in the United States or its territories who purchased tickets to a Live Nation event **at a venue in Illinois** that did not or cannot occur and to whom Defendants have not provided a refund. Excluded from the Class are (a) any person who has specifically requested a coupon in lieu of a refund; (b) all persons who are employees, directors, officers, and agents of either Defendant; (c) governmental entities; and (d) the Court, the Court's immediate family, and Court staff.

78.     Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

79.     Numerosity. Fed. R. Civ. P. 23(a)(1).  Defendants have stated that there at least 55,000 events in its system that were scheduled to occur between March 1 and the end of 2020, and that they had only begun providing refunds to ticket holders for 12,000 of them, with another 5,000 potentially in the pipeline. Thousands of these events were set to occur at venues in Illinois, and almost every event entailed the sale of thousands of tickets. At a minimum, there are tens of thousands of Class Members but very likely many more. The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

80.     Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  Common issues include:

         a.     Whether Defendants' user agreement contains a valid agreement to arbitrate claims and/or class action waiver;

         b.     Whether or the extent to which Defendants' statements and representations constituted misrepresentations'

         c.     When an event that is suspended indefinitely amounts to a cancellation;

         d.     Whether Defendants' failure to issue refunds constitutes a breach of contract and/or conversion;

         e.     Whether Defendants knew or should have known that in the event of widespread event cancellations they would be unable to honor their refund obligations;

         f.     Whether Defendants' conduct is violative of state consumer protection laws, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*;

g. Whether Defendants' conduct is violative of the Illinois Ticket Sale and Resale Act, 815 ILCS 414 *et seq.*;

h. The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled.

81. **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class he seeks to represent. Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

82. **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Further, Plaintiff's counsel is competent and experienced in litigating class actions.

83. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

84. Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

85. Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Breach of Contract

**Plaintiff and Each Class Against Each Defendant**

86.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

87.     A contract was formed between Plaintiff and Class members on the one hand and Defendants on the other with respect to purchases of event tickets.

88.     The contract was offered by Defendants and formed at the time Plaintiff and the Class accepted it by using Defendants' website or app, creating their accounts, and/or making purchases. The contract includes Defendants' Purchase Policy.

89.     The Purchase Policy obligates Defendants to provide refunds for cancelled events.

90.     Plaintiff and the Class performed their obligations under the contract.

91.     Defendants breached the contract when they functionally cancelled events and did not refund customers' money.

92.     Defendants' breaches were willful and not the result of mistake or inadvertence.

93.     As a result of Defendants' breach of the contract, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Conversion

**Plaintiff and Each Class Against Each Defendant**

94.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

95.     Plaintiff and the Class owned and had a right to possess funds in the amount that they paid for tickets to events that cannot and will not take place.

96.     Defendants intentionally and substantially interfered with property belonging to Plaintiff and the Class by taking possession of it, refusing to refund it to Plaintiff, preventing Plaintiff and the Class from having access to it, and/or refusing to return it to Plaintiff after a demand was made for its return.

97.     Plaintiff and the Class did not consent to Defendants' conduct in withholding their funds.

98.     Defendants' exercise of dominion and control over Plaintiff's property was knowing and wrongful.

99.     Plaintiff and the Class were harmed by Defendants' conduct.

100.    The conduct of each Defendant was a substantial factor in causing this harm to Plaintiff and the Class.

101.    As a result of Defendants' conduct, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation

### Plaintiff and Each Class Against Each Defendant

102.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

103.    Defendants represented to Plaintiff that a fact was true; namely, that if they purchased tickets to Defendants' events, they would be able to get a refund if that event was cancelled.

104.    Defendants' representation was not true.

105.    Even if Defendants believed that the representation was true they had no reasonable grounds for believing that it was true when they made it given their stated awareness of the potential for widespread cancellations due to any number of foreseeable circumstances.

106.    Defendants intended that Plaintiff and the Class would rely on their representation so that they would purchase event tickets.

107.    Plaintiff and the Class reasonably relied on Defendants' representations in making their purchases.

108.    Plaintiff and the Class were harmed.

109.    Plaintiff's, and the Class' reliance on Defendants' representations was a substantial factor in causing their harm.

110.    As a result of Defendants' misrepresentation(s), Plaintiff and other Class members have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2, et seq.

### Plaintiff and Each Class Against Each Defendant

111.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

112.     The "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/2, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce.

113.     In the course of conducting business, Defendants committed unfair or deceptive acts and practices by concealing, suppressing, or omitting material facts, as set forth more fully herein.

114.     Defendants intended that Plaintiff and each of the other members of the Illinois Class would rely upon its conduct, and a reasonable person would in fact be misled by this conduct.

115.     In addition, Defendants' conduct showed malice and recklessness such that an award of punitive damages is appropriate.

## FIFTH CAUSE OF ACTION

### Violation of the Illinois Ticket Sale and Resale Act, 815 ILCS 414/1.5, et seq.

### Plaintiff and Each Class Against Each Defendant

116.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

117.     Under Illinois Law, ticket brokers and resellers must guarantee a full refund of the amount paid by the purchaser, including all fees paid, if an event is cancelled and not rescheduled.

118.     Further ticket brokers and resellers are required to maintain a consumer protection rebate fund in an amount in excess of $100,000, which must be "cash available for immediate disbursement" for satisfaction of unpaid claims.

119.     Defendants are ticket brokers and/or resellers under Illinois law and violated the Illinois Ticket Sale and Resale Act by failing to pay to Plaintiff and other Class Members a full cash refund for all amounts including fees paid for tickets to a cancelled or constructively cancelled events for which there is no rescheduled date.

120.     As a result of Defendants' conduct, Plaintiffs and other Class Members suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### Plaintiff and Each Class Against Each Defendant

121.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

122.    By keeping funds paid to them for events that will not and cannot occur, Defendants have unjustly retained a monetary benefit.

123.    That benefit was retained to the detriment of Plaintiff and the Class, who are deprived of their own money during the worst economic crisis in living memory.

124.    Plaintiff and the Class have a better claim to the benefit than do the Defendants.

125.    Defendants' retention of the benefit violated the fundamental principles of justice, equity, and good conscience.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)    Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)    Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendants to disgorge profits they realized as a result of their unlawful conduct;

(c)    Order Defendants to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d)    Order Defendants to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and class members;

(e)    Declare Defendants conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(f)    For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)    For costs of the proceedings herein;

(h)    For reasonable attorneys' fees as allowed by statute; and

(i)    Award such other relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a jury on issues so triable.

DATED: April 23, 2020                              Respectfully submitted,


                                                  **LIDDLE & DUBIN, P.C.**

                                                  s/ Nicholas A. Coulson

                                                  Steven D. Liddle
                                                  sliddle@ldclassaction.com
                                                  Nicholas A. Coulson
                                                  ncoulson@ldclassaction.com
                                                  975 E. Jefferson Avenue
                                                  Detroit, Michigan 48207
                                                  Tel: 313-392-0015
                                                  Fax: 313-392-0025

                                                  *Attorneys for Plaintiff and the Putative
                                                  Class*